565 So.2d 961 (1990)
STATE of Louisiana, Appellee,
v.
Robert M. HONEYMAN, Appellant.
No. 20501-KA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 1990.
*963 Hall & Golden by William D. Hall and W. Eugene Golden, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Paul J. Carmouche, Dist. Atty., Richard L. Carney, Tommy J. Johnson, Asst. Dist. Attys., for appellee.
Before NORRIS and HIGHTOWER, JJ., and JASPER E. JONES, J. Pro Tem.
JASPER E. JONES, Judge Pro Tem.
The appellant, Robert M. Honeyman was charged by bill of information with vehicular homicide in violation of LSA-R.S. 14:32.1.[1] He was convicted by a six-man jury and sentenced to serve the minimum sentence of two years at hard labor. He appealed his conviction and sentence. He briefed seven of his thirty-six assignments of error. The first assignment of error complained of the trial court's failure to suppress a chromatograph blood test which was based on blood taken one hour and forty-five minutes after the accident and showed defendant's blood alcohol level to be .16 percent which is above the blood alcohol level that is a condition of vehicular homicide under LSA-R.S. 14:32.1(A)2.
This court found the blood test should have been suppressed because the administration of the test failed to comply with the requirements articulated in the case of State v. Rowell, 517 So.2d 799 (La.1988). This court reversed the conviction and remanded the case to the district court for a new trial. State v. Honeyman, 545 So.2d 698 (La.1988). The supreme court granted certiorari on application of the state. State v. Honeyman, 556 So.2d 46 (La.1990). The supreme court reviewed the court of appeal decision pursuant to the writ grant and in an opinion rendered on April 30, 1990, found the Rowell case inapplicable to the Honeyman case and reversed the court of appeal's determination that the blood test should have been suppressed. The supreme court held the results of the blood test were admissible and remanded the case to the court of appeal for consideration of the defendant's remaining six assignments of error which had not been considered by the court of appeal after it found the assignment of error related to the blood test had merit. State of Louisiana v. Honeyman, 560 So.2d 825 (La.1990).

FACTS
On October 20, 1985, at approximately 2:40 a.m., the defendant was operating his 1975 white four-door Cadillac occupied by Reginald Stanley on the front right seat and Wesley Jones on the back seat. The defendant approached the Old Blanchard Road Bridge in Caddo Parish at a speed of about fifty miles per hour. As defendant entered upon the bridge, he lost control of the vehicle which turned over on the first span of the bridge which collapsed. Reginald Stanley sustained a severe neck injury in the accident which caused his immediate death.

*964 ASSIGNMENT OF ERROR NO. 5[2]THE COURT ERRED BY NOT GRANTING DEFENDANT'S CHALLENGE FOR CAUSE OF JUROR SHARON CICERO.
One of the prospective jurors, Ms. Sharon Cicero, a laboratory technician employed by the City of Shreveport, was challenged by the defendant on the basis that she would be inclined to give more weight to the testimony of a police officer than other jurors might be inclined to do and that, if it was proven that the defendant's blood alcohol concentration was .10 gr.% or more, she would be inclined to believe that the alcohol was the cause of the accident.
The district court acknowledged the statements made by the prospective juror, but concluded that she had been rehabilitated when she stated that she could wait until all the evidence had been presented before deciding the matter, that she could be impartial, and that she was aware that law enforcement officers can exaggerate, make mistakes, or lie. Accordingly, he denied the defendant's challenge for cause as to this juror. The defendant, having exercised all of his peremptory challenges, was unable to exclude this juror from the jury which heard defendant's case. Having exhausted all of his peremptory challenges, defendant is entitled to complain of the denial of his challenge of this juror. State v. Heard, 408 So.2d 1247 (La.1982); State v. Smith, 430 So.2d 31 (La.1983), dissenting opinion (regarding a separate issue) at 432 So.2d 206 (La.1983).
LSA-C.Cr.P. Art. 797 provides as follows:
Art. 797. Challenge for cause
The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
The trial judge is vested with broad discretion in ruling on a challenge for cause, which ruling will not be disturbed on appeal absent a showing of abuse, that is, unless it is arbitrary or unreasonable. State v. McIntyre, 381 So.2d 408 (La.1980), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980); State v. Broadway, 440 So.2d 828 (La.App. 2d Cir.1983); State v. Pettaway, 450 So.2d 1345 (La.App. 2d Cir. 1984), writ denied, 456 So.2d 171 (La.1984).
The trial judge is vested with broad discretion in ruling on challenges for cause, and only where it appears upon review of the voir dire examination as a whole, that the judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will the court reverse the ruling of the trial judge. State v. Passman, 345 So.2d 874, 880 (La.1977).
The trial judge's refusal to excuse a prospective juror for cause is not an abuse of his discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence and the instructions given by the court. State v. Pettaway, supra; State v. Broadway, supra.
*965 While Juror Cicero testified that her best friend once was a police officer, that she has a lot of friends who are police officers, and that she might give more weight to the testimony of a police officer than might other members of the jury, she also readily acknowledged that police officers can exaggerate, or lie. She also repeatedly insisted that she could be impartial or fair.
In State v. Johnson, 469 So.2d 1099 (La. App. 2d Cir.1985), a prospective juror indicated that he might be generally inclined to give greater weight to the testimony of a law enforcement witness than a lay witness. However, the juror indicated that he would follow the court's instructions and weigh evidence accordingly. The court found the juror had been adequately rehabilitated.
In State v. Baldwin, 388 So.2d 664 (La. 1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981), rehearing denied, 450 U.S. 971, 101 S.Ct. 1493, 67 L.Ed.2d 622 (1981), one juror's brother-in-law was a police officer and he was personally acquainted with other law enforcement individuals. He admitted that he would favor a law enforcement officer's testimony over the defendant's because a law enforcement officer is a trained observer and has nothing to gain by giving false testimony. However, he admitted that law enforcement officers can make mistakes. He also claimed to have no preconceived notions concerning the case and could be a fair and impartial juror, free of any prejudice. The court found there was no basis to excuse the juror for cause.
Also in Baldwin, supra, another juror claimed that she tended to believe law enforcement officers over lay witnesses. She claimed that she tended to believe police officers because her son, who was once a police officer, had such a conscientious attitude about the law. However, she stated that she could base her decision solely on the evidence presented in the court. The court found there was no basis to challenge that juror for cause.
Although some of Ms. Cicero's remarks, taken out of context, might indicate a predisposition to convict or a tendency to disbelieve any witnesses except police officers, she was adequately rehabilitated when she indicated that she could be fair and impartial, and could wait until all the evidence had been introduced before arriving at a conclusion. She acknowledged that she would look at the evidence to see whether or not the elements of the crime had been proven beyond a reasonable doubt.
The trial judge did not abuse his discretion in rejecting the challenge of Ms. Cicero for cause.
ASSIGNMENT OF ERROR NO. 19 THE COURT ERRED IN PERMITTING THE STATE TO QUALIFY A WITNESS (CHARLES KERN) AS AN EXPERT IN ACCIDENT RECONSTRUCTION AND ACCIDENT INVESTIGATION.
In this assignment of error, defendant complains that the district court erred in concluding that Sgt. Charlie Kern of the Shreveport Police Department was competent to testify as an expert in accident reconstruction. The defendant argues that the nature of the specific accident in this case, which involved the collapse of a bridge, dictates that an accident reconstruction expert must be familiar with basic concepts of bridge dynamics and that Kern had no knowledge of bridge construction.
The state argues that the qualifying of an expert witness is a matter of discretion for the trial court and that ruling should not be reversed in the absence of evidence that the district court has abused its discretion.
Kern testified that the defendant's vehicle struck the right girder of the bridge as it entered upon the bridge and rode up the edge of the girder about twelve feet where it flipped over in mid-air as it came off the girder. The vehicle was airborne about sixty-five feet and came down with its top upon the surface of the bridge span which then collapsed as the vehicle slid another forty-five feet before coming to a stop against the bridge railing on the left-hand side of the bridge. As the Honeyman vehicle was upside down in the air, the *966 trunk lid came off the vehicle and struck the roof of the Burkett vehicle which was exiting the bridge about the time the Honeyman vehicle was entering upon it. Kern opined that the span collapsed when struck by the descending Honeyman Cadillac because it had been weakened by impact of the vehicle with the girder. Kern's version of the accident was supported by his finding of paint from the Cadillac located upon the bridge girder, the top of the Burkett vehicle, and by his finding of residue from the vinyl top of the Cadillac located on the surface of the bridge span, together with several gouge markings upon the bridge.
Before any witness can testify as an expert, his or her competence must be established to the satisfaction of the court. State v. Trosclair, 443 So.2d 1098, 1105 (La.1983), cert. dismissed, 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984); State v. Watson, 449 So.2d 1321, 1331 (La. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). Competence of an expert is a question of fact to be determined within the sound discretion of the trial judge and his rulings on the qualifications of experts will not be disturbed in the absence of manifest error, that is, unless they are clearly wrong. State v. Sherer, 411 So.2d 1050, 1054 (La.1982), on appeal after remand, 437 So.2d 276 (La.1983); State v. Trosclair, supra, at p. 1105.
The test of the competency of an expert is his knowledge of the subject about which he is called upon to express an opinion. State v. Sherer, supra, at p. 1054; State v. Ruple, 437 So.2d 873 (La.App. 2d Cir.1983); and State v. Coleman, 486 So.2d 995 (La.App. 2d Cir.1986), writs denied, 493 So.2d 633, 634 (La.1986). A combination of specialized training, work experience, and practical application of the expert's knowledge can combine to demonstrate that a person is an expert. See both State v. Smith, 448 So.2d 778, 780 (La.App. 2d Cir. 1984) and State v. Breckenridge, 506 So.2d 799 (La.App. 1st Cir.1987). A person may qualify as an expert based on experience alone. State v. Smith, supra.
Finally, where, as here, the witness is sought to be qualified as an expert for the first time, no unusual or more thorough than usual examination is required to establish competence; the trial judge is only required to satisfy himself that the witness's competency has been established prior to qualifying him as an expert. State v. Smith, supra.
Sgt. Kern testified that he is an accident investigator for the Shreveport Police Department. His job requires that he investigate all hit and run accidents, and all accidents involving life-threatening injuries or fatalities.
As part of his training, Sgt. Kern had attended a course in basic accident investigation in 1976 on the Baton Rouge campus of Louisiana State University, he had attended a seminar on advanced accident investigation and advanced accident reconstruction in 1985 sponsored by the Institute for Police Traffic Management in Jacksonville, Florida and, not long before the trial of the instant matter, he had attended a DWI vehicular homicide conference in Chicago. In addition, he had attended other seminars and schools sponsored by the Institute for Police Traffic Management regarding special problems in accident reconstruction and related areas.
Since 1976, when he was assigned to work with a DWI task force and other areas involving traffic investigation and enforcement, he has worked a "great number" of traffic accidents.
As part of his duty in investigating and reconstructing an accident, Sgt. Kern takes measurements and interviews witnesses to assist him in making estimates of distances traveled by motor vehicles, determining the final resting places of vehicles, points of impact, points of gouging, the path of a vehicle, the angle of its approach, and the angle of its departure.
Sgt. Kerns' job begins when he arrives at the scene of an accident and obtains information from the investigating officer concerning skid marks, a vehicle's impact against certain objects and the make, model and color of the vehicles involved.
In Jefferson v. Antee, 502 So.2d 148 (La. App. 3d Cir.1987), writ denied, 503 So.2d *967 494 (La.1987), which involved a very minor motor vehicle accident, the ultimate question was whether the plaintiff backed into defendant or vice versa. A police officer, whose testimony was based primarily upon physical evidence found at the scene, testified that the plaintiff had backed into the defendant. The court found that the district court was not in error in accepting that witness as an expert.
In State v. Pelt, 448 So.2d 1294 (La. 1984), cert. denied, 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984), defendant was charged with causing a motor vehicle accident which resulted in two deaths. The witness for the prosecution had been with the Louisiana State Police since July, 1967 and had been involved in accident investigation on a daily basis except for periods of schooling. He had the equivalent of an associate degree in law enforcement and had completed the Louisiana State Police Training Academy, 1968. He attended the Northwestern University of Illinois at Chicago for one year of special training in accident investigation and reconstruction. After his return, he taught the same course at the Louisiana Police Training Academy until 1981. His qualifications were previously considered in State v. Sherer, supra, where they were approved based upon "sufficient education and practical experience." The court found the witness to be an expert and permitted him to testify accordingly.
The record reveals that Kern had extensive formal training in accident investigation and many years of experience in this field. He had some courses in accident reconstruction. This background certainly justified the acceptance by the trial judge of Kern as an expert in the field of accident reconstruction. The fact that this accident occurred on a very old bridge in poor state of repair does not significantly alter the manner in which the expert would approach the reconstruction of the accident, although if the expert had knowledge of bridge design he would be better qualified to express an opinion as to the precise cause of the collapse of the bridge. The jury was well aware that Kern had no bridge expertise and was therefore capable of considering this deficiency in his expertise in evaluating his opinion on the reason for the collapse of the bridge.
This assignment of error has no merit.
ASSIGNMENT OF ERROR NO. 28 THE COURT ERRED BY SUSTAINING THE STATE'S OBJECTION TO THE OPINION TESTIMONY FROM DEFENDANT'S EXPERT WITNESS AS TO THE CONDITION OF THE ROADWAY CAUSING THE SEPARATION OF THE ROADWAY APPROACH FROM THE BRIDGE.
Defendant complains that he was not permitted to elicit an opinion from his expert, Dr. Hilman Deaton, an expert in safety engineering, concerning the inference to be derived from an item of physical evidence reflected on D-40, a photograph showing where the bridge separated from the roadway at the time of the bridge collapse.
The state contended the opinion which defendant was attempting to elicit from his expert in safety engineering was beyond the expertise of the witness.
The district court sustained the prosecution's objection, concluding that while the witness may have been generally versed in matters of industrial safety, that did not necessarily qualify him to render an opinion on the implications of a straight crack at the edge of the bridge and highway.
Defendant's expert testified that he was a private safety and health consultant. He has a Ph.D. in industrial psychology from California Western University and "completed safety engineering work at the Heinrich-Lateiner Institute in New York City." He testified that this course was the equivalent of a two-year postgraduate course.
He further testified that he was a member of professional organizations, had authored articles for professional periodicals, and had served as an officer or director of some of those same professional organizations during various periods.
He indicated that he had previously testified in court and had worked on numerous cases which did not end up in court. At the *968 time of trial, he was working as a private consultant and handled safety coordination for small companies that cannot afford full-time safety engineers.
On voir dire by the prosecution, Dr. Deaton testified that he had no degree in structural engineering, no type of degree in civil engineering, and had not recently taken any courses in accident reconstruction. He indicated that he had done accident reconstruction consultation, but had not qualified as an expert. He further indicated that his reconstruction experience was in the discovery stage of the proceedings.
When asked whether he had any degree in physics, he indicated that his only college degrees were in industrial psychology. He also testified with regard to his employment background.
Dr. Deaton was tendered as an expert in safety engineering and the court accepted him as such, with the prosecutor arguing that said expertise went no further than safety engineering.
On direct examination, Dr. Deaton testified that he had been retained to do investigative work in a civil suit related to the instant accident. He indicated that he went to the site of the accident in May, 1986, but did not cross the barricade which had been erected to secure the location.
He testified that he was not familiar with the bridge before this case and had been over it only a couple of times, but that he was familiar with publications and materials concerning bridge construction and maintenance.
Dr. Deaton testified that he was familiar with the use of signs in safety engineering. He indicated that a common standard in this type of case is to use a red light at each end of the bridge to allow only one direction of traffic to use the bridge at one time, similar to the system employed on the Red River Bridge at Coushatta. He indicated that there was any number of ways that this situation could be made safer.
Defendant then had Dr. Deaton identify D-40, a photograph of a point where the collapsed portion of the bridge met the highway. The exhibit was thereafter introduced into evidence and published to the jury.
However, when defendant sought to elicit from his expert his opinion concerning the meaning of some of the evidence contained in the photograph, the prosecution objected that any opinion of that nature would be outside the province of this witness's expertise. Despite argument to the contrary by defendant, the objection was sustained.
The witness was tendered and accepted as an expert in safety engineering and he conceded that he was not an expert in more technical matters requiring knowledge of engineering or physics, and did not wish to be put into the position of having to defend his testimony in this area of expertise. There was no testimony that the expert had any experience in the construction of roads and bridges nor the installation and attachment of bridges into the roadway.
The district judge did not abuse his discretion in refusing to permit this witness to render an opinion outside the scope of his expertise.
ASSIGNMENT OF ERROR NO. 32 THE COURT ERRED BY NOT GIVING DEFENDANT'S SPECIAL REQUESTED JURY CHARGE ON VEHICULAR HOMICIDE TO THE JURY.
Prior to the court's charging the jury, the defendant requested the following special jury charge:
Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle whether or not the offender had the intent to cause death or great bodily harm, if his blood alcohol concentration is 0.10% or more by weight based upon grams of alcohol per 100 cubic centimeters of blood. In order to convict you must additionally find a casual [sic] relationship between the blood alcohol concentration of 0.10% or more and the death of the victim. R.S. 14:92.1; State v. Taylor, 463 So.2d 1274 (La.1985). [Emphasis added.]
The language suggested by the defendant is a slight adaptation of a passage *969 from State v. Taylor, 463 So.2d 1274, 1275 (La.1985):
Giving the provisions of La.R.S. 14:32.1 a genuine construction, according to their context and with reference to their purpose, La.R.S. 14:3, we conclude that under the vehicular homicide statute, the state, in order to convict, must prove that an offender's unlawful blood alcohol concentration combined with his operation of a vehicle to cause the death of a human being. [Emphasis added.]
The instructions actually given to the jury on this issue are as follows:
Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle whether or not the offender had the intent to cause death or great bodily harm, if his blood alcohol concentration is 0.10 percent or more by weight based upon grams of alcohol per 100 cubic centimeters of blood as determined by chemical analysis of blood.
Thus in order to convict the defendant, you must find:
(1) that Robert M. Honeyman was operating a motor vehicle while his blood alcohol concentration was 0.10 percent or more by weight based upon grams of alcohol per 100 cubic centimeters of blood; and
(2) that Robert M. Honeyman's operation of a motor vehicle while in that condition was a direct or proximate cause of the death of Reginald Stanley.

Proximate or direct cause is that which, in a natural or continuance sequence, unbroken by any efficient intervening causes, produces the injury, and without which the result would not have occurred. [Emphasis added]
Defendant objected to the court's failure to include his requested jury charge. He argues that, had the special jury charge been given, the jury would have been able to conclude that the victim's death in the instant case did not result from the defendant's operation of the vehicle while in an intoxicated state, but from some other cause. The state argues that the requested jury charge was included in the general jury charge.
The district judge refused to give the requested jury charge because it was included in the general charge.
A trial judge is required to give a requested charge which does not require qualification, limitation, or explanation and is not included in general charges or another special charge if it is wholly correct and pertinent to the case. LSA-C.Cr.P. Art. 807; State v. Beck, 445 So.2d 470 (La.App. 2d Cir.1984), writ denied, 446 So.2d 315 (La.1984); State v. Pettaway, supra, and State v. Hobdy, 494 So.2d 1321, 1328 (La. App. 2d Cir.1986), writ denied, 502 So.2d 110 (La.1987).
A comparison of the requested jury charge and the charge actually given discloses that the requested charge was included in the given charge. While the given charge was lengthier and did not use the same words which the defendant had requested, the general instruction included a clear statement of the law which the defendant had incorporated in his requested special instruction.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 36 THE COURT ERRED IN ENTERING A JUDGMENT OF CONVICTION FOR VEHICULAR HOMICIDE BECAUSE THE EVIDENCE WAS NOT SUFFICIENT TO SUSTAIN A CONVICTION.
Defendant asserts that, viewing the evidence in the light most favorable to the prosecution, the evidence fails to support defendant's conviction for vehicular homicide. The main thrust of defendant's argument consists of the slight difference in theories from the prosecution's two accident reconstruction experts and the testimony of James Burkett, the guest passenger in the vehicle going the opposite direction on the bridge at the time of the *970 accident.[3] Based upon these portions of the record, defendant argues that it is just as likely that the bridge collapsed, causing the accident, rather than that the defendant struck the bridge and vaulted, causing the bridge to collapse. Essentially, defendant argues that his alcohol consumption did not cause, but merely coincided with, the accident. State v. Taylor, supra.
Viewing the evidence in the light most favorable to the prosecution, the following can be said to have been proven:
I. Defendant was engaged in the operation or was in actual physical control of a motor vehicle;
1. Those at the scene who removed defendant from the vehicle testified that he was behind the steering wheel and that his feet were tangled in the foot pedals of the automobile;
2. The backseat passenger in defendant's vehicle, Charles Wesley Jones, testified that defendant was driving at the time of the accident;
3. Defendant testified that he was driving at the time of the accident;
II. Defendant's blood alcohol concentration was .16%. This met the .10% or more requirement of the statute. The test establishing the blood alcohol level was found admissible by the supreme court.
1. State's alcohol expert Jimmy Barnhill testified that the defendant's blood alcohol level drastically reduced his ability to see, and otherwise react and control his vehicle.
III. Defendant's car struck the right girder of the northwest side of the old Blanchard Road bridge. The impact caused a bending of the girder and deprived the northwest span of one of its main load-bearing girders and caused the collapse of the bridge. The State's two accident reconstruction experts essentially agree that the following scenario transpired:[4]
1. The right front of the car rode up the girder some 12 feet;
2. The speed of the car, combined with the weight of the car and the angle of the girder, caused the vehicle to vault off of the girder and become airborne;
3. While the girder was raising the right side of the car, the left side was staying lower, causing the car to twist in a counterclockwise fashion while moving forward;
4. After vaulting off the girder, the car's counterclockwise twisting caused it to flip over while in mid-air.
5. Approximately 65 feet from the girder, the car landed on its roof on the northwestern-most span of the bridge, crushing the car's roof and causing the victim's fatal injuries;
6. After landing, the car slid on its roof approximately 43 feet until it came to rest on the edge of the northwest span and the middle span of the bridge.
7. The experts opined that the accident would have occurred in essentially the same way, even had the bridge not collapsed.
IV. Defendant killed Reginald Stanley and the killing was caused proximately and directly by defendant's operation of a motor vehicle while his blood alcohol concentration was .10 or more.

*971 1. The victim died when his neck was hyperflexed forward, dislocating the spine and lacerating the spinal cord, causing immediate cardiorespiratory arrest.
From the evidence reviewed, there is no doubt that when it is viewed in a light most favorable to the state a rational factfinder could have found the defendant is guilty beyond a reasonable doubt of the crime of vehicular homicide. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 35 THE COURT ERRED IN SENTENCING DEFENDANT TO SERVE TWO YEARS AT HARD LABOR INSTEAD OF PROBATION.
The defendant assigns as error that he was sentenced to two years at hard labor instead of being placed on probation. The state argues that the record does not disclose any abuse of sentencing discretion.
A sentence violates LSA-Const. Art. 1, § 20 (1974) if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985). The trial judge has wide discretion in the imposition of a sentence within the statutory limits and such a sentence should not be set aside as excessive absent a manifest abuse of discretion. State v. Square, 433 So.2d 104 (La.1983).
A trial court is not required to render a suspended sentence or probation on a first felony offense. The judge may consider whatever factors and evidence he deems important to a determination of the best interest of the public and the defendant. State v. McKethan, 459 So.2d 72 (La.App. 2d Cir.1984); State v. Tully, 430 So.2d 124 (La.App. 2d Cir.1983), writ denied, 435 So.2d 438 (La.1983).
The record clearly supports that the district court tailored the sentence imposed in accordance with the seriousness of the crime and the background of the defendant. While acknowledging that the defendant and the victim were friends and that the defendant is remorseful for what happened, the judge also noted that the defendant's demeanor during the trial was somewhat cavalier, especially given the seriousness of the charges against him.
The district court noted that the defendant is 24 years old, married and has one child. He further noted that the defendant had been discharged from the Air Force only a couple of months prior to the accident.
The court acknowledged that the defendant was employed at the time and had an opportunity for a new and better job.
While noting that the defendant was a first offender and eligible for probation, the district court indicated that the seriousness of the crime was a large factor in the sentence imposed and that the aggravating factors in the case outweighed any mitigating factors.
While acknowledging that the incarceration was going to be a hardship to the defendant's family, the district judge opined that any sentence less than incarceration would tend to deprecate the seriousness of defendant's crime. Accordingly, he sentenced the defendant to serve two years at hard labor, the minimum possible sentence under the statute. The statute provided for a maximum hard labor sentence of five years.
The fact that the defender is a first felony offender and was eligible for a probated sentence does not show the trial judge abused his discretion, because the defendant was heavily intoxicated and operating a car without control of his faculties which caused him to have a serious accident that killed one man and injured another. Other lives could have been lost as a result of defendant's conduct which showed a total disregard for the welfare of the public. The trial judge individualized the sentence *972 to the defendant and the sentence is not excessive.
This assignment has no merit.
The conviction and sentence are affirmed.
AFFIRMED.
NORRIS, J., concurs with written reasons.
NORRIS, Judge, concurs.
I concur in the result. I do not fully agree with the treatment of assignment of error No. 5.
NOTES
[1] 32.1. Vehicular homicide

A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, vessel, or other means of conveyance whether or not the offender had the intent to cause death or great bodily harm whenever any of the following conditions exist:
(1) The offender is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.
(2) The offender's blood alcohol concentration is 0.10 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood. * * *
[2] The number of the briefed assignments of error used by defendant in his brief have been used to designate the assignments of error in this opinion.
[3] Burkett testified that he saw the lights of Honeyman's vehicle approaching the bridge from the opposite direction at a point when the Burkett vehicle was about halfway across the bridge. Burkett seemed to have no other knowledge of the relationship between the Honeyman vehicle and the collapse of the bridge. Burkett could not describe the collision that occurred between the bridge girder and the Cadillac. Burkett did not know the location on the bridge span of the Honeyman vehicle at the time that Burkett felt the span dropping under his vehicle and observed the falling of parts from the superstructure of the bridge upon his car. Burkett's testimony is not necessarily inconsistent with the testimony of the state's two accident reconstruction witnesses.
[4] The only significant area of disagreement between the state experts was that Herd believed the bridge collapsed immediately following the impact between the car and the girder, whereas Kern believed the collapse occurred when the car fell from the air onto the surface of the span which had been weakened at the impact of the vehicle with the girder.